*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

CHARMAINE DYSON,

UNPUBLISHED
July 16, 2025
9:50 AM

Plaintiff-Appellant,

v

No. 369798
Wayne Circuit Court
LC No. 22-011504-CD

CITY OF DETROIT and BOYSIE JACKSON,

Defendants-Appellees.

Before: LETICA, P.J., and MURRAY and PATEL, JJ.

PER CURIAM.

In this action alleging violations of the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq*., plaintiff appeals as of right the trial court order granting summary disposition in favor of defendants, City of Detroit (the city), and Boysie Jackson (Jackson). We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

This case arises from plaintiff's employment with the city. Plaintiff[1] is a single mother of four children, including son AM. Plaintiff began working for the city in 2007. In 2014, plaintiff obtained a job in the finance department working in payroll. At that time, Jackson worked as the deputy director of procurement. Jackson had a payroll issue and went to the payroll department where he met plaintiff. The two flirted,[2] conversed, and exchanged personal phone numbers. Plaintiff was purportedly advised that she better not mess up Jackson's paperwork because of his position with the city. The two had multiple contacts to resolve Jackson's issue. Early one morning, plaintiff went to Jackson's office to address his payroll issue. She asserted that Jackson

---

[1] Plaintiff initially filed her complaint as "L.D." and raised the claims of quid pro quo and hostile work environment sexual harassment. The trial court granted Jackson's motion to remove the pseudonym. Consequently, plaintiff filed an amended complaint disclosing her name and continued to raise the same two theories under ELCRA.

[2] Plaintiff asserted that Jackson flirted with her, not that it was mutual flirtation.

coerced her into performing oral sex upon him. At the conclusion of the act, Jackson purportedly gave plaintiff $100, and plaintiff spent the money. In Jackson's view, plaintiff was the aggressor, and she voluntarily initiated and performed the sex act upon him. At the conclusion of the act, plaintiff asked for money, and he gave her $100.

The next year, plaintiff alleged that Jackson called her and asked to meet for dinner. Plaintiff agreed to the meeting because she was nearby. They met at a Troy restaurant, and Jackson paid for the dinner. Plaintiff alleged that Jackson pulled her body into his own while they were in the parking lot. Although plaintiff later left the payroll department and became an employee of the city's police department as a civilian 911 operator, plaintiff did not report Jackson's actions to any authority figure with the city.[3]

In 2017, Jackson advised plaintiff of a work event held in Ferndale, and she attended. Jackson walked plaintiff to her car. The two agreed that an act of oral sex occurred while in the car and that plaintiff moved her vehicle to avoid public view. While Jackson alleged that the sexual act was consensual, plaintiff claimed that she performed the act to get Jackson out of her vehicle. At the conclusion of the act, plaintiff claimed that Jackson handed her $200. But, Jackson asserted that plaintiff expressly requested money, and he gave it to her. Jackson testified that plaintiff acknowledged having difficulties at her employment as a 911 operator and asked him to let her know of any job opportunities in the procurement department. By this time, Jackson had been promoted to the position of director of procurement.

Jackson notified plaintiff of an opening in the procurement department, and she applied. Jackson claimed that he played no role in the interview process and that he was not her direct supervisor. And, once plaintiff obtained the position, he kept his distance from her. Although plaintiff agreed that Jackson did not participate in the interview, she claimed that Jackson was one of her supervisors.

Between 2018 and 2022, plaintiff did not receive positive performance evaluations for her work in the procurement department. The majority of the evaluations were prepared by Ericka Crawford and indicated that plaintiff needed to improve her performance. Because of the pandemic, plaintiff began working remotely for the city in 2020. Between 2020 and 2022, plaintiff and Jackson did not engage in sexual acts. But, plaintiff had introduced her son AM to Jackson. Jackson began to mentor AM, aided AM in obtaining a city internship, and gave AM $300.

Because of AM's internship in 2022, plaintiff began to drive to the city to pick up AM. Plaintiff would go into the office early and meet with Jackson. On one occasion, plaintiff recorded a sexual encounter and conversation with Jackson without his knowledge. Specifically, plaintiff was heard moaning as she performed a sex act upon Jackson. After the act, Jackson inquired what he had to do, and plaintiff responded, "car note" then giggled. Jackson used the "Cash App" to transfer $500 to plaintiff. After the sex act, plaintiff remained in Jackson's office and spoke to him for at least 30 minutes. Thereafter, in a second recorded meeting with Jackson, plaintiff requested additional money to aid in the payment of her bills. She sought $1200 from Jackson

---

[3] Plaintiff alleged that she told a cousin and a friend who also worked at the city about the sexual acts.

because she was late paying her rent. Jackson asked plaintiff for a list of her bills. After the amount was provided, Jackson advised plaintiff that he could not help her with her bills because of the large amount.

In the course of their personal interactions, plaintiff sent Jackson text messages. She referred to him as "sweetheart" and "baby" and sent him kissy face emojis. Plaintiff's son AM sent Jackson a Father's Day card, and plaintiff wished Jackson a happy Father's Day. Plaintiff insisted that she used these references because Jackson expressly requested them. If she did not do as Jackson asked, plaintiff claimed that he embarrassed and humiliated her in front of other staff. Yet, after one sexual encounter, plaintiff texted Jackson that she "enjoyed" him and that she "aimed to please."

Plaintiff learned from Crawford that Jackson was in the process of retiring. In June 2022, Jackson advised plaintiff of his intent to retire, take the remainder of the year off, and then begin employment in the private sector. Jackson indicated his plan to hire city employees at his new job. He proposed that plaintiff come to work for him in the private sector, and she responded positively.

But between Jackson's offer of employment and his retirement, plaintiff learned that her most recent procurement department evaluation was not positive and that she would not receive a salary merit increase. Plaintiff questioned Jackson about her review. After addressing the issue with the managers, Jackson advised that she might receive a merit increase the next year. Plaintiff advised Jackson that she would take the issue of his "abuse" to human resources. Five weeks later, plaintiff filed this suit, raising two violations of ELCRA, specifically quid pro quo and hostile environment sexual harassment.

Defendants moved separately for summary disposition of both sexual harassment claims, asserting that plaintiff could not demonstrate the requirement that the sexual contact was unwelcome. Plaintiff opposed the dispositive motions, claiming that there were factual issues that precluded summary disposition. The trial court granted the motions, determining that the evidence, when viewed in the light most favorable to plaintiff, reflected an affair and consensual relationship for which money was exchanged at plaintiff's request. From this decision, plaintiff appeals.

## II. STANDARD OF REVIEW

A trial court's decision on a motion for summary disposition is reviewed de novo. *White v Henry Ford Macomb Hosp Corp*, 346 Mich App 405, 419; 12 NW3d 635 (2023). A motion for summary disposition premised on MCR 2.116(C)(10) tests the factual sufficiency of the complaint. *Id*. The moving party must identify and support the issues to which the moving party believes there is no genuine issue of material fact, and the affidavits, pleadings, depositions, admissions, and other documentary evidence submitted with the motion must be examined. *Charter Twp of Pittsfield v Washtenaw Co Treasurer*, 338 Mich App 440, 449; 980 NW2d 119 (2021). Once the moving party makes and supports its motion, the opposing party may not rest on mere allegations or denials in the pleadings, but must submit documentary evidence setting forth specific facts to demonstrate a genuine issue for trial. *Id*. A genuine issue of material fact is presented when reasonable minds could differ on an issue after viewing the evidence in the light most favorable to

the nonmoving party. *Mapp v Progressive Ins Co*, 346 Mich App 575, 584; 13 NW3d 643 (2023) (citation omitted).

## III. ANALYSIS

Plaintiff alleges that the trial court erred in granting defendants' motions for summary disposition as a matter of law because plaintiff presented sufficient evidence demonstrating a jury issue pertaining to her claims of quid pro quo and hostile work environment sexual harassment. We disagree.

"An employer shall not . . . [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment because of . . . sex[.]" MCL 37.2202(1)(a).

> Discrimination because of sex includes sexual harassment. Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:
>
> (*i*) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing.
>
> (*ii*) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment, public accommodations or public services, education, or housing.
>
> (*iii*) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, education, or housing environment. [MCL 37.2103(k).]

Thus, the ELCRA prohibits an employer from discrimination premised on sex, which includes sexual harassment. *Elezovic v Ford Motor Co*, 472 Mich 408, 419; 697 NW2d 851 (2005). The first two subdivisions, MCL 37.2301(k)(*i*) and (*ii*), reference quid-pro-quo sexual harassment, and the third subdivision, MCL 37.2301(k)(iii), describes hostile environment sexual harassment. See *Hamed v Wayne Co*, 490 Mich 1, 9-10; 803 NW2d 237 (2011). The ELCRA provides relief from two basic types or theories of sexual harassment, quid-pro-quo sexual harassment and sexual harassment caused by a hostile or offensive work environment. *McCalla v Ellis*, 180 Mich App 372, 377; 446 NW2d 904 (1989). As a preliminary matter, the plaintiff must allege facts demonstrating that she was exposed to "unwelcome sexual advances," "requests for sexual favors," or "conduct or communication of a sexual nature" before actionable sexual harassment can be established under any theory. *Corley v Detroit Bd of Educ*, 470 Mich 274, 279; 681 NW2d 342 (2004). The burden is on the plaintiff to demonstrate a nexus between the unwelcome sexual conduct and the employment situation. *Id.*

There are five elements to a quid pro quo claim of sexual harassment: (1) the employee is a member of a protected group; (2) the employee was subject to unwelcome sexual harassment; (3) the harassment objected to was premised on sex; (4) the employee's reaction to the harassment impacted tangible aspect of the employee's compensation, terms, conditions, or privileges of employment; and (5) respondeat superior. *McCalla*, 180 Mich App at 378 (citation omitted). "The fourth element is established where the employee in a supervisory position encourages or demands sexual favors in return for some employment benefit." *Id*. Similarly, to establish a prima facie case of sexual harassment premised on a hostile work environment, the following must be shown: "(1) the employee belonged to a protected group; (2) the *employee* was subjected to communication or conduct on the basis of sex; (3) the *employee* was subjected to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior." *Elezovic*, 472 Mich at 412 n 4 (citation omitted).

In both quid pro quo and hostile work environment sexual harassment, it must be established that the sexual conduct was unwelcome. And the supervisor must encourage or demand sexual favors in return for some employment benefit. *McCalla*, 180 Mich App at 378 (citation omitted). In the present case, when plaintiff and Jackson met they were both city employees, with plaintiff acting as a payroll clerk and Jackson as the deputy director of procurement. Thus, their respective city employments served as the manner in which they met. But, Jackson did not have supervisory authority over plaintiff. Although plaintiff disputed whether she flirted with Jackson, it was undisputed that the two exchanged personal phone numbers. When plaintiff went to Jackson's office to assist him in completing forms, she performed a sex act. Yet, plaintiff did not identify a demand by Jackson for the sex act in return for an employment benefit, and plaintiff had the burden of establishing such a nexus. *Id*.; see also *Corley*, 470 Mich at 279. Rather, at the conclusion of the sex act, Jackson gave plaintiff money, and she accepted it and spent it.[4]

Moreover, plaintiff continued her relationship with Jackson outside of working hours. Plaintiff met Jackson for dinner at a restaurant in Troy, and he paid for her dinner. At that time, plaintiff did not work in his department. Additionally, Jackson notified plaintiff of an event being held in Ferndale. Again, at that time, plaintiff did not work for Jackson, but was employed by the police department as a civilian 911 operator. Yet, she performed a sex act upon him in her car and received money at the conclusion of the act. Plaintiff did not notify any of her superiors of any unwelcome acts or notify Ferndale police. Additionally, plaintiff was notified of performance issues in her role as a 911 operator. Thus, plaintiff asked Jackson to aid her in finding a new position with the city. When a position opened up in Jackson's procurement office, plaintiff interviewed for and accepted the position. But, Jackson did not participate in the interview process.

Plaintiff continued to perform sex acts on Jackson. Although plaintiff believed that she was compelled to do so to maintain her employment, plaintiff acknowledged that she was having

---

[4] Plaintiff asserted that Jackson simply handed her money after the sex act, but Jackson claimed that plaintiff requested money after their encounters.

financial issues, had money judgments against her, and declared bankruptcy in 2017. Thus, plaintiff's completion of a sex act upon Jackson, while in his department's employ, was followed by a request for a $500 car note payment. In response, Jackson gave plaintiff $500 for the car payment using the "Cash App." Additionally, plaintiff advised Jackson of her expenses and sought his financial assistance to make her late rental payment. After reviewing plaintiff's expenses, Jackson declined to assist her, citing the amount of her bills and his inability to divert such a large amount of his family's funds without question. Again, plaintiff's financial benefits from Jackson predated her employment in the procurement department. Moreover, this financial arrangement did not reflect a nexus between an unwelcome sexual act and an employment benefit, but a personal benefit to plaintiff in light of her monetary issues. Even viewing the evidence in the light most favorable to plaintiff, reasonable minds could not differ on the issue that plaintiff's preexisting personal and financial arrangements occurred before her employment in Jackson's procurement department. *Mapp*, 346 Mich App at 584. In fact, plaintiff suffered from persistent personal financial issues and poor performance evaluations while in the various positions she held at the city.

To the extent that plaintiff claims that Jackson caused her humiliation and embarrassment before her colleagues by his demeanor and tone in a meeting, she could not identify the persons present and timeframe of this meeting. She further acknowledged that Jackson apologized to her after addressing her sternly. Indeed, Jackson testified that it was stressful to be the director of procurement. In light of the totality of the evidence, plaintiff failed to meet her burden of demonstrating that the conduct was unwelcome. *Corley*, 470 Mich at 279. Accordingly, the trial court did not err in granting defendants' motions for summary disposition.

Affirmed.

/s/ Anica Letica
/s/ Christopher M. Murray
/s/ Sima G. Patel