MARTHA CRAIG DAUGHTREY, Circuit Judge,
concurring in part and dissenting in part.
In the 33 years since January 1979, much has transpired in our world to provide platforms for voices that were previously muzzled or muffled. The Berlin Wall, the Soviet Union, and despotic regimes in the Middle East have crumbled as citizens of the world successfully struggled to air their grievances and concerns. Computers that once occupied entire rooms are now out-performed by devices that we carry in our pockets or purses and that give ordinary individuals access to information that provides a more-level playing field in the electronic age.
Despite those advances, however, during those same 33 years, James Chandler, Sr., has been continually thwarted in his quest to seek redress for the unconscionable brutality visited upon his daughter, Janet. For more than a quarter of a century, the identity of the barbarians who inflicted the pain upon the Chandler family was kept secret through means of a perverted sense of honor and loyalty fostered by a company that is, ironically, in the business of making people feel safe and secure. More recently, Chandler’s efforts have been subverted by the very courts to which he turned for assistance. In concluding that James Chandler is barred by the applicable statute of limitations from pursuing his claims against Wackenhut, I believe that the majority opinion in this case has adopted a far-too-narrow interpretation of the information before it. I concur in that opinion’s holding that Chandler has not established a plausible entitlement to relief on his claim of negligent hiring. I respectfully dissent, however, from that portion of the majority’s decision that would bar the plaintiff, on statute-of-limitations grounds, from proceeding further with his claim that Wackenhut is liable for the negligent supervision or retention of some of its employees.
In reaching its conclusions, the majority opinion notes that “[tjhis diversity action arises from the horrific abduction, rape, and murder of Janet Chandler.... ” The relatively sterile recitation of the facts of the crimes that follows that statement fails, however, to convey the brutality of the actions of Wackenhut employees that drove the company to conceal from the police and from the Chandlers the deeds of its agents. I do not believe that the more clinical recounting of the events leading to Janet Chandler’s death is simply a matter of writing style. Instead, I believe that the majority opinion’s downplaying of the gruesome details of the crimes helps justify its conclusion that the employer could not have had an overriding interest in suppressing information about its operations and employment decisions. In reali *433 ty, however, in light of the alleged ingrained culture of silence at Wackenhut, the more egregious the nature of the actions undertaken by Wackenhut employees, the more likely that supervisors and employees alike would conceal information that would be damaging to the company.
Because James Chandler’s appeal is presented in the posture of a challenge to the district court’s grant of the defendant’s motion to dismiss, our review must accept Chandler’s factual allegations as true and construe his complaint in the light most favorable to him. See, e.g., Watson Carpet & Floor v. Mohawk Indus., 648 F.3d 452, 456 (6th Cir.2011). Consequently, our legal analysis should be informed by the following factual allegations made in Chandler’s amended complaint:
In October 1978, union workers at the Chemtron Corporation chemical plant in Holland, Michigan went on strike. Chemtron executives- contracted with [Wackenhut] to provide extra security to protect the plant’s property and its nonunion, non-striking workers.
About 70 out-of-town [Wackenhut] security guards took up temporary residence at the Blue Mill Inn motel in Holland, just a few miles from the plant. Twenty-one-year-old Laurie Swank was the motel manager. Swank’s roommate, Janet Chandler, worked the overnight shift as a front desk clerk.
[Wackenhut] security force supervisor, Arthur Paiva stayed in a guest house at the Chemtron plant.
Before long, relationships formed between female staff members at the Blue Mill Inn and a group of hard-drinking, hard-partying security guards.
Some of [Waekenhut’s] guards became intimate with the motel manager, other desk clerks, and housekeeping staff.
Many of these relationships were sexual and non-monogamous in nature.
[Wackenhut] security guard James Nelson, frequently groped Janet Chandler in public and made comments about sexual acts he wanted to perform with her. The sexual escapades between the guards and the motel staff bred jealousy and anger, much of it directed at Janet Chandler. Those feelings were fueled by other female employees at the Blue Mill Inn.
As the labor strike at Chemtron wound down, several guards and motel employees hatched a scheme to teach Janet Chandler a lesson. The plan involved sexual and physical violence. Janet Chandler was going to be taken to a guest house where she would be beaten and sexually assaulted. It was understood that Janet Chandler was not going to be coming back from this location, and that she was going to be killed. On January 30, 1979, Janet Chandler worked the overnight shift at the motel. Sometime after midnight, January 31, James Nelson and another of [Wacken-hut’s] security guards, Robert Lynch, went into the Blue Mill Inn office and told Janet they were taking her to a surprise party at [Wackenhut] guard supervisor Arthur Paiva’s guest house.
When Janet Chandler stepped out from behind the front desk, [Wackenhut] security guards Nelson and Lynch grabbed her and pinned her arms behind her back. They clamped handcuffs on her wrists, then led her to a waiting car. From a balcony above the motel office, several of [Wackenhut’s] security guards — including Anthony Williams— and a group of female motel employees watched [Wackenhut] security guards Nelson and Lynch shove Janet Chandler into the back seat of the car.
A short time later, [Wackenhut] security guards Nelson and Lynch went back to the motel. Lynch called the police just *434 after 2:00 a.m. and reported a robbery at the motel. When the police arrived, Lynch told them the night clerk was missing.
At the Chemtron guest house, [Wacken-hut] security guard supervisor Arthur Paiva held Janet Chandler captive until Nelson and Lynch returned. Then the party got started.
During the next few hours, at least 15 to 20 people — including six female motel employees — gathered at [Wackenhut] security supervisor Paiva’s guest house, and nearly all of them either participated in or witnessed the beating, rape, and eventual strangulation murder of Janet Chandler.
Laurie Swank (Janet’s roommate and boss at the Blue Mill Inn) has admitted that she was present at the guest house during the incident, and that she verbally assaulted Janet Chandler as she was being beaten and raped. Laurie Swank admitted that she knew Janet Chandler was going to be killed and was present when Janet Chandler died.
Swank also said she saw [Wackenhut] security supervisor Paiva rape Janet Chandler.
While [Wackenhut] security supervisor Paiva was raping Janet Chandler-whose eyes and mouth had been covered with duct tape-the security boss shouted at her, “You’re going to die, bitch. You’re going to die.”
When [Wackenhut] security supervisor Paiva finished, he encouraged other guards to take turns raping Janet Chandler.
[Wackenhut] security guard Freddie Parker also raped Janet Chandler.
[Wackenhut] security guard Parker took off his belt and wrapped it around Janet Chandler’s neck. [Wackenhut] security guards Nelson, Lynch, and Parker used the belt to repeatedly choke Janet Chandler into unconsciousness while they beat and raped her.
[Wackenhut] security guard James Nelson raped Janet, with Janet Chandler on her stomach and her hands restrained behind her back, while Nelson enforced intercourse.
[Wackenhut] security guard James Nelson forced Janet Chandler to perform oral sex on him while he, Nelson, pulled on the belt which was around Janet Chandler’s neck.
[Wackenhut] security guard Anthony Williams masturbated while he watched fellow guards rape Janet Chandler. Later, Williams was seen choking Janet Chandler with a belt while forcing her to perform oral sex on him.
Once everyone finished, [Wackenhut] security guard Lynch choked Janet Chandler to death.
After Janet Chandler died, there was mass panic through the guest house. Many of the party guests pitched in to clean up the crime scene. [Wackenhut] security guards Anthony Williams and Robert Lynch wrapped Janet Chandler’s body in a sheet and put her in a car. Lynch drove the car nearly 40 miles south and dumped Janet Chandler in a snowdrift beside Interstate 196 in Van Burén County, Michigan.
[Wackenhut] security guard supervisor Paiva and the other [Wackenhut] security guards told the female motel workers to keep quiet. If they ever talked about what happened, the guards threatened, they would get the same treatment Janet Chandler had gotten.
A snowplow driver found Janet Chandler’s naked body the next day.
Arthur Paiva conspired with other [Wackenhut] guards to cover up the rape and murder of Janet Chandler, so *435 as to “protect” themselves and to protect [Wackenhut] from criminal and civil liability.
Arthur Paiva concocted a scheme wherein Robert Lynch would falsely report to the police the abduction of Janet Chandler from her job at the Blue Mill Inn, an affirmative act designed to avoid detection and conceal “the claim” and the identities of “any person who is liable for the claim.”
Arthur Paiva and other [Wackenhut] “guards” consciously chose to use condoms when they raped Janet Chandler, an affirmative act designed to avoid detection and conceal “the claim” and the identities of “any person who is liable for the claim.”
Arthur Paiva and other [Wackenhut] “guards” consciously chose to wash Janet Chandler’s corpse, an affirmative act designed to avoid detection and conceal “the claim” and the identities of “any person who is liable for the claim.”
Arthur Paiva and other [Wackenhut] “guards” consciously chose to remove Janet Chandler’s corpse from the guest house he occupied as the lead [Wacken-hut] “guard” supervisor and dump her dead body in a snowbank nearly 40 miles away, an affirmative act designed to avoid detection and conceal “the claim” and the identities of “any person who is liable for the claim.”
Arthur Paiva affirmatively lied to the police in an interview immediately following the discovery of Janet Chandler’s dead body, denying any knowledge and -lying to the police, an affirmative act designed to avoid detection and conceal “the claim” and the identities of “any person who is liable for the claim.”
Arthur Paiva forced Patty Ward, his ex-girlfriend and witness to the rape and murder of Janet Chandler, to provide a false alibi for him, threatening her with murder, an affirmative act designed to avoid detection and conceal “the claim” and the identities of “any person who is liable for the claim.”
Arthur Paiva, likewise caused Laurie Swank, a witness to the rape and murder of Janet Chandler, to affirmatively lie to the police in an effort to cover up the rape and murder, threatening her with death, an affirmative act designed to [] avoid detection and conceal “the claim” and the identities of “any person who is hable for the claim.”
Arthur Paiva forced Cheryl Ruiz, a maid at the Blue Mill Inn and witness to the rape and murder of Janet Chandler, to “keep quiet” and affirmatively lie to the police in 1979, threatening that she “would end up just like Janet Chandler,” an affirmative act designed to avoid detection and conceal “the claim” and the identities of “any person who is liable for the claim.”
Arthur Paiva made the conscious choice to have Ronald Wirick, a [Wackenhut] “guard” assigned to photography of the Chemtron strike activities, attend the January “party” for Janet Chandler.
Arthur Paiva made the conscious choice to have Ronald Wirick photograph the rape and murder of Janet Chandler and the persons present.
Ronald Wirick followed orders and took a 24 exposure roll of film, giving it to another [Wackenhut] “guard” with the intent of transferring the images to Arthur Paiva per his order.
Arthur Paiva made the conscious choice of having the rape and murder of Janet Chandler and its attendees documented to blackmail all present into silence, an affirmative act designed to avoid detection and conceal “the claim” and the identities of “any person who is liable for the claim.”
Indeed, Arthur Paiva threatened Ronald Wirick to keep silent, an affirmative act *436 designed to avoid detection and conceal “the claim” and the identities of “any person who is liable for the claim.” Arthur Paiva actually attended the funeral of Janet Chandler, another affirmative act designed to avoid detection and conceal “the claim” and the identities of “any person who is liable for the claim.”
* * * * * *
Glenn Johnson, a [Wackenhut] “guard” present at the rape and murder of Janet Chandler testified at the trial of Paiva, et al, that [Wackenhut] had a motto in 1979 of “I know nothing, see nothing, and speak only in kind words.”
Glenn Johnson, a [Wackenhut] “guard” present at the rape and murder of Janet Chandler testified at the trial of Paiva, et al, that “they knew a scandal was not to be attached to the company name.” At the time of the rape and murder of Janet Chandler, [Wackenhut] actively promoted a culture of omertá, or code of silence, an affirmative act designed to avoid detection and conceal “any claim” and the identities of “any person who is liable for the claim.”
[Wackenhut]’s guard, James Nelson, in addition to participating directly in the brutal rape and murder of Janet Chandler, actively promoted the coverup by reporting to authorities that he was speaking with Janet Chandler on the phone and overheard the “abduction,” an attempt to corrupt the truth that he was actually in on the deviant scheme, an affirmative act designed to avoid detection and conceal “the claim” and the identities of “any person who is liable for the claim.”
James Nelson, being the person on the phone with Janet Chandler when she was “abducted,” was a “popular” person with the police and the media following the discovery of Janet Chandler’s dead body.
According to testimony elicited at the murder trial on October 26, 2007, within two-days of the brutal rape and murder of Janet Chandler, [Wackenhut]’s “corporate office” directed Arthur Paiva to secrete himself and James Nelson in a Holiday Inn hotel to avoid media attention, an affirmative act designed to avoid detection and conceal “the claim” and the identities of “any person who is liable for the claim.”
(Paragraph numbering and capitalization omitted.)
Given the passage of the many years since the murder of Janet Chandler, James Chandler’s only hope of resurrecting a long-expired cause of action against Wackenhut is to allege and establish that the defendant “fraudulently concealed] the existence of the claim or the identity of any person who is liable for the claim from the knowledge of the person entitled to sue on the claim.... ” Mich. Comp. Laws § 600.5855. By doing so, the courts may then toll the statute of limitations and permit the litigation of James Chandler’s civil liability claims against Wackenhut.
Under Michigan law, “[fjraudulent concealment means employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquirement of information disclosing a right of action.” Doe v. Roman Catholic Archbishop of the Archdiocese of Detroit, 264 Mich. App. 632, 692 N.W.2d 398, 405 (2004). Mere silence, however, is not sufficient to constitute fraudulent concealment. See id. at 406. Thus, in Doe, a case involving suit against a Roman Catholic diocese for allegedly concealing the identity of a priest responsible for the sexual abuse of a parish altar boy, the Michigan Court of Appeals ruled that the diocese’s representation of the priest as fit, its reassignment of the priest to different parishes, and the concealment of the sexual abuse activities *437 of the priest did not constitute the employment of artifice. “Rather, through these acts, [the diocese] avoided disclosing [the priest’s] actions and the [diocese’s] knowledge of them to the public at large.” Id.
The majority opinion in this case recognizes that Chandler’s amended complaint does allege that Wackenhut fraudulently concealed its involvement in the murder of Janet Chandler by “(1) maintaining a motto of T know nothing, see nothing, and speak only kind words’; (2) telling employees that ‘a scandal was not to be attached to the company name’; (3) and directing two perpetrators to secrete themselves to avoid media scrutiny.” By citation to Doe, however, the majority then analogizes the code of silence employed by Wackenhut to the transfer of duty stations and avoidance of disclosure found in the situation involving the sexually-abusive clergyman. Were the analysis to end at that point, I would be bound by Michigan case law to concur in the majority’s resolution of this appeal because fostering a policy of “I know nothing, see nothing, and speak only in kind words” is effectively no different from the archbishop’s avoidance of disclosure in Doe. Similarly, simply ensuring that no scandal is attached to Wackenhut’s name is arguably tantamount to the archbishop’s vouching for the fitness of the offending priest — an action that Doe also equated with “mere silence” that will not constitute fraudulent concealment. Even Wacken-hut’s direction that Paiva and Nelson hide out in another motel is not substantively different from the archbishop’s decision in Doe to transfer the pedophile priest to another parish that would be unaware of his deviant proclivities.
I firmly believe, however, that other acts undertaken by Paiva do indeed involve more than the mere avoidance of disclosure to the public at-large and actually do constitute the “employment of artifice, planned to prevent inquiry or escape investigation, and mislead or hinder acquirement of information disclosing a right of action.” Id. (quoting Tonegatto v. Budak, 112 Mich.App. 575, 316 N.W.2d 262, 266 (1982) (citations omitted)). Consequently, such acts may serve to toll the statute of limitations on James Chandler’s filing of his civil suit against Wackenhut.
Specifically, Paiva, as a Wackenhut supervisor, was alleged to have devised the plan to report to police that Janet Chandler had been abducted from her post at the Blue Mill Inn while speaking on the phone with Nelson. He was also involved in removing Janet Chandler’s corpse from his residence to a snowbank nearly 40 miles away. Additionally, rather than simply remaining silent in the face of police questioning, Paiva affirmatively lied to the police by claiming no knowledge of the events of the early morning crime spree. Moreover, he threatened other witnesses with death should they be tempted to divulge the truth behind the kidnaping, rape, and murder, and he had another individual photograph the criminal deeds and the persons present in order to blackmail those persons into silence.
Wackenhut, the district court, and the majority opinion discount the relevance of such misdeeds by Paiva, however, by contending that Paiva was clearly exceeding the scope of his authority in committing those acts. According to their arguments, because Paiva’s depraved acts were not within the scope of the authority granted him by Wackenhut, those misdeeds cannot be attributed to the company so as to toll any statute of limitations for bringing suit for the negligent hiring, supervision, or retention of its thuggish employees.
Without question, Michigan law clearly provides that “the fraudulent concealment act does not operate against persons who do not participate in the concealment.” Stoneman v. Collier, 94 Mich.App. 187, 288 *438 N.W.2d 405, 407 (1979). As explained by the state court in Stoneman, “The fraudulent concealment act punishes concealment. It would be inequitable ... to punish [a company] for acts of concealment engaged in by a third party.” Id. Contrary to the majority, however, I am convinced that James Chandler has at least raised a plausible claim that Paiva was indeed acting within the authority bestowed upon him by Wackenhut and is not a third party for the purposes of this suit.
The Michigan Supreme Court has defined the term “within the scope of employment” to mean “engaged in the service of his master, or while about his master’s business.” Hamed v. Wayne Cnty., 490 Mich. 1, 803 N.W.2d 237, 244 (2011) (citation and internal quotation marks omitted), cert. denied, — U.S. -, 132 S.Ct. 1014, 181 L.Ed.2d 736 (2012). Consequently, “[ijndependent action, intended solely to further the employee’s individual interests, cannot be fairly characterized as falling within the scope of employment.” Id. Nevertheless, even if an act is contrary to an employer’s instructions, the employer will still be liable for the employee’s acts “if the employee accomplished the act in furtherance, or the interest, of the employer’s business.” Id.
Paiva was the company’s supervisor of a security force of individuals from around the country who had come to Holland, Michigan, to preserve the peace in what was obviously a potentially volatile labor dispute. As the supervisor, Paiva was charged with the responsibility of ensuring compliance with Wackenhut’s written and unwritten policies, including the alleged policies of “I know nothing, see nothing, and speak only in kind words,” and “a scandal was not to be attached to the company name.” The fact is beyond peradventure that dissemination of information that out-of-town security guards living in a local motel kidnapped, raped, and murdered a young woman due to jealousy in the provision of sexual favors would besmirch Wackenhut’s brand and permanently attach a scandal to the company’s name. Although it is true that the actions to conceal the crimes committed against Janet Chandler were also, or even in large part, done to shield Paiva himself from criminal liability, it is equally plausible that the concealment was also intended to spare Wackenhut negative publicity that would result in its own collateral consequences. In light of the culture promoted by the company, therefore, Paiva’s actions to hide the company’s connection to the crimes were not outside the scope of his authority, but rather were in strict conformity with, and demanded by, it.
Moreover, the very nature of Wacken-hut’s operations lends credence to the allegation that Paiva was not acting outside the scope of his authority in performing and allowing the atrocities committed against Janet Chandler. The Wackenhut guards were brought into the Holland, Michigan, area from around the country in order to represent the interests of the company. In that area, Paiva himself was the very face of the company, indeed was Wackenhut, and, as supervisor of the guards, was responsible for directing the guards’ activities while engaged by Chem-tron. As the representative of Wacken-hut’s policies and procedures in Holland at that time, Paiva’s decisions regarding protection of the corporate image were the decisions of Wackenhut itself and could not, therefore, have been outside the scope of his authority to represent the company during the period of its hire by Chemtron.
Nevertheless, even finding that Paiva was arguably acting within the scope of his authority when he undertook to conceal the involvement of Wackenhut employees in the heinous activities of January 31, 1979, would not necessarily result in a *439 reversal of the district court’s grant of Wackenhut’s motion to dismiss. As is now well-established, to survive a motion to dismiss, “the complaint’s ‘factual allegations must be enough to raise a right to relief above the speculative level,’ and ‘state a claim to relief that is plausible on its face.’ ” Watson, 648 F.3d at 457 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).
In support of his claim that Wackenhut negligently hired certain employees, James Chandler alleges that at least one other security firm had, as early as 1976, utilized psychological and psychiatric fitness tests to ensure that its employees would not exhibit the violent tendencies that individual Wackenhut employees did in this case. The amended complaint does not, however, allege that any particular Wackenhut employee would have failed such a fitness test at the time of hiring. Without some indication that the defendant company should have been aware of the proclivities of its potential employees, James Chandler’s negligent-hiring cause of action is purely speculative and fails to state a claim that is plausible on its face. I thus agree that the district court did not err in dismissing count one of the first amended complaint.
By contrast, the second count of the amended complaint, alleging negligent supervision or retention of employees, does satisfy the Twombly standard for withstanding a motion to dismiss. In the complaint, James Chandler claims that the security guards living temporarily at the Blue Mill Inn were “hard-drinking” and “hard-partying.” He also asserts that many of the guards engaged in sexual, non-monogamous, jealousy-inducing relationships with female members of the motel staff, and that one guard, James Nelson, “frequently groped Janet Chandler in public and made comments about sexual acts he wanted to perform with her.” Accepting such allegations as true, as we must at this stage of the litigation, it is at least plausible that the Wackenhut supervisor, aware of such interactions and circumstances, should have taken appropriate actions to prevent violent sexual encounters between the guards and the motel employees. For these reasons, I believe that count two of James Chandler’s amended complaint was erroneously dismissed and that the negligent-supervision- or-retention count should be remanded to the district court for such further proceedings as are necessary.
I respectfully dissent from that portion of the majority opinion that would hold otherwise.