EBERLE BREWING CO. *v.* BRISCOE MOTOR CO.

1. NEGLIGENCE—CONTRIBUTORY NEGLIGENCE—HIGHWAYS AND STREETS —RULES OF THE ROAD.

In an action for the value of a horse, killed at a street intersection by collision with an automobile driven by defendant's servant, where the evidence was open to the construction that the driver of the horse swung to the left to avoid the collision, when his proper course would have been to go straight on past the center of the street before turning, the question of contributory negligence was properly a question for the jury.

2. MASTER AND SERVANT—AUTOMOBILES—SCOPE OF EMPLOYMENT— LIABILITY OF EMPLOYER.

A tester, employed by an automobile factory to test and inspect engines and chassis in the course of manufacture for it by another company, was not acting within the scope of his employment so as to render his employer liable for the value of a horse killed by collision with a machine not yet delivered or accepted, driven by said employee after his hours of service were over, which he had borrowed to use over Sunday for his own pleasure; nor would the fact that he was voluntarily driving a salesman of his employer to the station at the time render the latter liable.

Error to Jackson; Parkinson, J. Submitted October 17, 1916. (Docket No. 159.) Decided December 21, 1916.

Case by the Eberle Brewing Company against the Briscoe Motor Company for the killing of plaintiff's horse. Judgment for plaintiff. Defendant brings error. Reversed, and no new trial ordered.

*Forrest C. Badgley,* for appellant.

*Reece & Blackman,* for appellee.

OSTRANDER, J. An automobile, going west on Wildwood avenue in the city of Jackson, and a team of

horses, going south on West avenue, were in collision near the northeast corner of the intersection of these streets, and one of the horses was injured and because of his injuries was killed. This action is brought by the owner of the horse against the alleged employer of the man who drove the car, for the value of the horse. That the driver of the car was at the moment negligent was conceded, and it is assumed that the concession is rested upon the rate of speed, 15 miles an hour or more, that the car was driven to the street intersection.

Two questions were submitted to the jury as questions of fact, namely, whether plaintiff's servant in charge of the team was negligent, and whether the driver of the car was at the time in the service of the defendant. These questions were answered by the jury favorably to plaintiff, for which a verdict was returned and a judgment entered. Both of these questions, it is contended by defendant, should have been answered, as matter of law, favorably to defendant.

Some of the material facts are not in dispute. Plaintiff's driver wanted to turn east on Wildwood avenue (to turn to the left), and his team trotted down West avenue to the intersection and entered Wildwood avenue. The traffic regulation which required him to turn east on the south side of Wildwood was known to the driver. The car was going west on the north side of Wildwood, near the curb. What happened was that the off horse—right-hand horse—of the team was injured, either because the driver was trying to turn the corner near the curb, or because, seeing the car approaching, the driver pulled his team and swung them to the left in an effort to avoid a collision. The car was swung out to the south, but not far enough to avoid striking or being struck by the horse, the right shoulder of which was broken, and right hoof pulled from the leg. Other facts are in dispute.

Plaintiff's driver testified:

"As I got out on Wildwood avenue about to make the turn, I saw this rig coming from the east," 60 or 70 feet or more away. He says the rear of the car struck the off horse in the breast. He was just about in the middle of the street (West avenue) when he started to turn. "The team was trotting out there, and I got to the corner first, and I thought I could get around. I had a right to turn the corner because I come out first the way I figured it. * * *

"*Q.* Where were you trying to go. You were trying to go on the north side?

"*A.* No; I thought I could turn the corner and go on east. I thought I could turn the corner and go on east before the car—ahead of this car, but I saw the car was so close I had to stop and figure any way possible to get out of the way of it. * * *

"*Q.* You could see far enough so you could stop to avoid a collision with an automobile if you saw an automobile coming, couldn't you?

"*A.* That depends. If you get to the corner first, you have got a right to the corner, I should think. That's the way I have figured it out.

"*Q.* Is that the way you figured that day, you got there first and had a right to it?

"*A.* I didn't see anybody in sight when I got there so I went on to turn the corner. * * *

"*Q.* Then you saw this car when it was 60 or 70 feet away; why didn't you, instead of turning your team and going directly toward the front end of the car, turn it the other way?

"*A.* I didn't start turning them at that time.

"*Q.* You kept right on going?

"*A.* I got on the corner first, and I was going to take the corner first.

"*Q.* You got to the corner first, and you were going to take it first. So after you saw this car 60 or 70 feet away, you kept right on going toward the crossing?

"*A.* Yes.

"*Q.* You didn't do a thing until you were right down there to the curb, did you?

"*A.* Until I saw they weren't going—wasn't looking where they were going, and I saw I had to do some-

thing, and I didn't have time to get across, and they were coming on.

"Q. You could see them during that entire 60 or 70 feet, you observed that?

"A. Sure I knew.

"Q. You knew he didn't see you. That's right, isn't it?

"A. He didn't see me until the other fellow nudged him.

"Q. You knew that all the time until he nudged him, until this man with Mr. Greenamyer nudged him, you knew Mr. Greenamyer didn't see you?

"A. I don't think he did. He was looking around at the houses or something.

"Q. You didn't think he did see you, and you kept right on going until you reached the crossing?

"A. Yes, sir.    *    *    *

"Q. You thought you could get across, and you concluded to try to get across, didn't you?

"A. Getting to the corner first, I thought I had a right to the corner.

"Q. You knew that Mr. Greenamyer didn't see you and wasn't looking at you?

"A. He wasn't looking at me, sure."

These excerpts from the driver's testimony, and much more of his testimony, indicate that he did not intend to drive south, on the west side of the street, to and beyond the center of the intersecting street before turning east, but that he intended to turn to the east upon entering the street, he having got to the corner first. Such driving, both of teams and of automobiles, may be witnessed almost any day by an observing person, who will see drivers turning to the left at street intersections close to the curb. The result is that drivers approaching from the left, who have the right to turn the corner sharply to the right, if that is their route, are met by those turning wrongfully to the left. But the testimony of the plaintiff's driver is open to the construction that, seeing danger, he did not turn the corner to the left nor seek to do so; that as he entered Wildwood avenue, seeing that the automobile

driver had not discovered his approach, he pulled his horses—attempted to swing them to the left to avoid collision, acting as it seemed to him best to act under the quickly developed circumstances. The jury might well have found plaintiff's driver guilty of negligence contributing to the injury. It was peculiarly a question for a jury, and their conclusion is not so clearly wrong that the court should disturb it.

The car which was in collision was a chassis—no body—which had been made, or its parts assembled, by the Lewis Spring & Axle Company under contract to manufacture engines and chassis for the Briscoe Motor Company. It had not been delivered to the Briscoe Motor Company, and was a new machine, never before driven on the road. Its driver, Greenamyer, was an employee of the Briscoe Motor Company who spent his time, or most of it, at the plant of the Lewis Spring & Axle Company inspecting and examining the machines for his employer. He was there for convenience of both contracting parties, but represented and was paid by the Briscoe Motor Company. The accident occurred Saturday afternoon. Mr. Greenamyer took the machine to drive, intending to keep it out over Sunday. A man had called at the Lewis Spring & Axle Company plant who represented himself to be a salesman of the Briscoe Motor Company, and who desired to go to one of the plants of that company in another part of the city. Mr. Greenamyer volunteered to take him to the plant, and was on his way when the collision occurred. As matter of fact, he took him to the plant, waited a few minutes for him, took him to the railroad station, and then drove the car home and drove it on Sunday. The testimony is undisputed that Greenamyer had finished his work for the day when he left the Lewis Spring & Axle Company plant with the car. There is no testimony tending to prove that he was employed by the Briscoe Motor Company to

drive this machine, at this time, or to carry a passenger for his employer, or for any one else. His trip was for the accommodation of the salesman who rode with him, or for his own pleasure, or both. It may be inferred that it was because he was an employee of the Briscoe Motor Company, and his passenger represented himself to be a salesman for that company, that Mr. Greenamyer volunteered to drive the salesman to the Briscoe Motor Company's plant and from thence to the railroad station. But it does not appear that the salesman passenger was upon any business of the Briscoe Motor Company, and if inference is resorted to, it may be inferred that his visit was made in his own interest. Beyond this it is not made to appear that Mr. Greenamyer was in any sense acting within the scope of his employment. The car did not belong to him, nor to his employer. It was borrowed from the Lewis Spring & Axle Company, as other cars had been at other times borrowed. Mr. Greenamyer had the permission of the owner to use the car. It is quite probable that his employment secured him permission to use the car. The rule which plaintiff invokes is the rule which makes an employer responsible for the conduct of his servant, a part of which is that the servant must be acting within the scope of his employment. In recent cases the doctrine and its application were considered, and it was said:

"The phrase 'in the course or scope of his employment or authority,' when used relative to the acts of a servant, means while engaged in the service of his master, or while about his master's business." *Riley* v. *Roach,* 168 Mich. 294 (134 N. W. 14, 37 L. R. A. [N. S.] 834) ; *Brinkman* v. *Zuckerman,* 192 Mich. 624 (159 N. W. 316).

It would be an invasion of the rule, and a false application of it, if it was held that a servant may, at any time, volunteer to borrow a car and carry a pas-

senger, or for his own use drive it, at his master's risk.

The court should have directed a verdict for defendant. The judgment is reversed, with costs to appellant, and a new trial is not ordered.

STONE, C. J., and KUHN, BIRD, MOORE, STEERE, and BROOKE, JJ., concurred. PERSON, J., did not sit.