# STATE OF MICHIGAN

# COURT OF APPEALS

BRITTNYE CARLSON,

        Plaintiff-Appellant,

v

MESQUITE, INC., doing business as HENRY VIII-SOUTH,

        Defendant-Appellee.

and

BRIAN BRADLEY,

        Defendant

UNPUBLISHED
March 28, 2017

No. 329147
Wayne Circuit Court
LC No. 14-007341-NO

Before: BECKERING, P.J., and SAWYER and SAAD, JJ.

BECKERING, P.J. (*dissenting*).

In this interlocutory appeal, I respectfully dissent from my colleagues' conclusion that no reasonable jury could find that defendant bouncer Brian Bradley was acting within the course of his employment when providing bouncer services to defendant strip club Mesquite, Inc. during the incident in which plaintiff Brittnye Carlson was purportedly injured. Due to the unique circumstances of Bradley's employment relationship with the strip club and the nebulous nature of his work schedule, I would reverse the trial court and remand for a jury trial on the issue, along with the other matters that remain pending for jury resolution.[1]

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

As noted by the majority, this personal injury action arises out of the conduct of a strip club bouncer who stepped in on his night off to provide bouncer services for his employer when a fight broke out at the strip club, and in the process, plaintiff, a bystander to the fight, sustained

---

[1] This Court granted plaintiff's application for leave to appeal the trial court's dismissal of Mesquite, Inc. under MCR 2.116(C)(10). *Carlson v Mesquite Inc*, unpublished order of the Court of Appeals, entered February 18, 2016 (Docket No. 329147).

-1-

a broken arm.  According to the deposition testimony, at the time of the incident in question, Bradley worked as a bouncer for Henry VIII-South strip club, owned by defendant Mesquite, Inc.[2]  Plaintiff was purportedly an independent contractor working as a stripper at defendant's club and was working the night a fight broke out on August 17, 2013, between two other dancers.

Pertinent to the issue on appeal is Bradley's employment relationship with defendant. Bradley testified that he began working as a doorman/bouncer at John's Hot Spot, a club owned by defendant, in May 2011.  From there, he began "filling in holes" anywhere from two to five days a week at defendant's other strip clubs, including Henry VIII-South.  He testified:

A:  . . . . So I worked in the kitchen at Bogart's[3] and John's Hot Spot.  From there just branched out, knew they needed help at the other club, Henry VIII-South, worked there too.  So basically I was working at all three clubs at the same time.

\*\*\*

A:  Well, each of them I worked a couple of days a week; the only one that I worked consistently was at Bogart's.

\*\*\*

A:  . . . .I was basically filling in holes.  It wasn't an actual schedule, it was just filling in holes.  Like, say, Brian needed this day off, I worked for him, and then at the other clubs he knew what days I worked.  Or if they needed me to work a day, then he'd switch with me or something.  It was basically like a call-in.  I know you have to work here, but we might need you here, do you think you can switch, blah, blah, blah.

\*\*\*

Q:  So it wasn't like a consistent schedule, it was more like just you were always at one of these clubs and they kind of assigned you as needed.

A:  Yes.

---

[2] For purposes of the summary disposition motion only, defendant Mesquite, Inc. did not contest the contention that Bradley was its employee.  Although Bradley remains a defendant in this action, he is not participating in this appeal.  Therefore, my use of the term "defendant" is in reference to Mesquite, Inc.

[3] Bradley was also a cook at Bogart's, one of defendant's strip clubs.  While he volunteered to do some cooking at other strip clubs, not including Henry VIII-South, which did not serve food, his work for the other strip clubs was as a bouncer.

By the summer of 2013, Bradley was working primarily at Henry VIII-South. However, his schedule remained inconsistent and he would work as a bouncer whenever Dominic Evitts, the club's manager, called him. He testified:

Q: When you were working at just that one club there [Henry VIII-South], did you still have that same kind of scheduling thing where you'd just come in when they called you?

A: Yes.

Q: So you didn't have a consistent schedule, you just came in when [Evitts] gave you a call?

A: Yes.

As a bouncer, Bradley had various security responsibilities. In the event of a fight, it was his responsibility to "[s]eparate, detain, [and] move [people] out of the building," which Bradley characterized as a standard operating procedure. Bradley has had to break up several fights in the past as a bouncer.

Bradley testified that on the evening of August 17, 2013, he arrived at the strip club as a patron at approximately 10:30 p.m. He watched a basketball game on television and had a drink while waiting for a friend to arrive.[4] Bradley and several witnesses testified that a fight broke out between two of the club's dancers, being Erica Patton and Jennifer Osborn. Osborn was not performing that night, and she grew upset over the attention Patton was paying to Osborn's boyfriend, Lee Greenidge. Words were exchanged and the altercation became physical. Bradley testified that as Evitts and another bouncer were trying to remove Osborn and Greenidge from the building, Patton and another dancer, Christina Theodore, started running toward the fracas. Seeing that his colleagues were about to be outnumbered by those involved, Bradley decided to step in to intercept Patton and Theodore and detain them in the bathroom until the situation was under control.[5] He did not remove them from the building because he knew they were working that night. He then waited until Evitts came and let him know what to do from there.

Bradley testified that Evitts did not say anything to him at the time he stepped in to help out because Evitts was busy dealing with the fight himself. Bradley testified that it is "[k]ind of a numbers game. If there's two of them, there's four, you kind of need some help because they've got them coming from behind. . . . If [Evitts] is facing this way with the doorman trying to get them out the door and you've got these two coming from behind, it kind of makes sense to

---

[4] Evitts confirmed that Bradley was not scheduled to work that night, but one witness testified to his belief that Bradley was working at the time of the fight because he saw Bradley behind the bar earlier in the evening and entering the dressing room after the fight.

[5] Bradley testified that he did not recall seeing where plaintiff was at the time of the incident, and he did not recall coming into contact with anyone other than Patton and Theodore, but Greenidge testified that he saw Bradley restraining plaintiff.

stop them before they come over their back." When asked why he stepped in to pull Patton and Theodore away from Evitt and the other bouncer as they were removing Greenridge and Osborn from the building, Bradley testified:

> A. Well, it's basically having their -- I still work with these guys, it's having their back. Do you want me to sit there and just be, oh, wow, you guys were really in a bad situation right now, sorry I didn't help? It's not -- we don't work like that.

> Q. Do you think [Evitts] would have wanted you do [sic] intervene and help out like that?

***

> Q. . . . . Had there been any previous instances where I guess you weren't on duty a certain night but you helped out around the bar anyway?

> A. Yeah, we all do it, all of us. We're all like teammates.

> Q. From these previous instances where you had worked, I guess visited the bar on your off days and you helped out—

> A. Other guys have done the same thing. It's just we're all—we all look at each other like we're one unit. So we don't sit there and just sit back and watch. If you're fighting him and, you know, these two came together, if he comes over to attack you, I'm not going to sit there and just watch if me and you are hanging out; if we work together, I'm not going to sit there and watch, I'm going to stop him or try to help you with this guy.

> Q. So from your previous experiences, where you had gone to the club and helped out when it was your off day, do you believe from those experiences that [Evitts] would have wanted you to help out in this instance as well?

***

> A. Oh, I would imagine so. He wouldn't say what are you doing, why are you trying to help us out, we got it.

> Q. All right.

> A. Like I said earlier, it comes down to a numbers game. If there's more of them than there is us and I sit on the sideline, I'm not really doing anybody a service.

> Q. Do you feel like it's your job to help them out even on your off days?

* * *

*A.* Okay.  No, I don't.  It's just it make sense, though.  Like I said, if we're a team we're going to have each other's backs.

At his deposition, Evitts testified that the bouncers at Henry VIII-South were scheduled for work informally by verbal request; he did not keep a written schedule for them.  His scheduling of the bouncers was "[n]othing very official.  Kind of just not really a meeting.  Maybe a phone call or just a verbal walk-by and talk to."  With regard to Bradley, who worked as needed, Evitts would not write anything down.  He would just call Bradley and ask him to show up on the days he was needed.  Evitts testified that Bradley was a good bouncer and had defused several fights in the past without incident.  When asked whether there was a protocol for bouncers helping one another when a fight broke out, Evitts testified, "Yeah.  Everybody kind of groups together.  They would help each other out.  Nobody would sit there and watch the other one break up a fight."  He agreed that it was a team effort, and that if two people were fighting, one bouncer might be overwhelmed.  Although Evitts testified that Bradley was not scheduled to work that night, he recalled Bradley being there "to hang out" and assumed Bradley checked in with him and the two said hello to one another when Bradley arrived.

Plaintiff testified that she was not involved in the fight that broke out, but rather, she was telling Osborne and Patton not to fight when Bradley grabbed her, lifted her up off the ground, and pushed her into the dressing room, which led to her broken arm.

Plaintiff filed the instant action.  In Count I of her amended complaint, plaintiff alleged assault and battery against Bradley and defendant (based on a theory of respondeat superior), associated with Bradley's conduct when stepping in to assist in breaking up the fight that had transpired.  In Count II of her complaint, she alleged negligent hiring and employment against defendant.

Following discovery, defendant moved for summary disposition pursuant to MCR 2.116(C)(10).  As noted above, for purposes of the motion only, defendant stipulated that Bradley was an employee rather than an independent contractor, and that he pushed plaintiff down.  With regard to Count I, defendant sought to avoid liability by arguing that Bradley's actions were intentional and criminal and that he was not acting within the course and scope of his employment because he was "off the clock" at the time of the fight.[6]  Plaintiff argued that a genuine issue of material fact existed with regard to whether Bradley was acting within the course and scope of his employment, pointing out that Bradley's hours were not fixed and clear-cut and that he testified that he and the other bouncers worked as a team and that he entered the fight in order to carry out his employment duties, which he felt were necessary and appropriate under the presenting circumstances.  Plaintiff called defendant's argument regarding Bradley's alleged criminal conduct a red herring factually and legally.

---

[6] Count II is not at issue on appeal.  Plaintiff indicated through her attorney at the July 30, 2015 hearing on defendant's motion for summary disposition that she was abandoning her negligent hiring and employment claim, and she makes no argument relative to that claim on appeal.

-5-

The trial court granted defendant's motion for summary disposition based on Bradley's not being "on the clock" at the time the fight broke out, and instead, being at the bar for social purposes; as such, the court concluded that Bradley was not working within the scope of his employment.

## II. ANALYSIS

Plaintiff contends that the trial court erred in granting defendant's motion for summary disposition because she presented sufficient evidence to establish a genuine issue of material fact as to whether Bradley was acting within the scope of his employment when he committed the acts that resulted in plaintiff's injuries. I agree.

Whether an employee is acting within the scope of employment is generally an issue for the trier of fact. *Bryant v Brannen*, 180 Mich App 87, 98; 446 NW2d 847 (1989). Generally, an employee acts within the scope of employment if the employee is "engaged in the service of the master, or while about the master's business." *Hamed v Wayne County*, 490 Mich 1, 11; 803 NW2d 237 (2011) (quotation marks and citation omitted). Where employees engaged in their employers' work " 'step[] aside from [their] employment to gratify some personal animosity or to accomplish some purpose of [their]own[,]' " they are operating outside the scope of their authority. *Burch*, 122 Mich App at 804, quoting *Martin v Jones*, 302 Mich 355, 358; 4 NW2d 686 (1942).

The trial court granted summary disposition to defendant based on the court's reasoning that *Eberle Brewing Co v Briscoe Motor Co*, 194 Mich 140; 160 NW 440 (1916), established a bright-line rule requiring an employee to be "on the clock" at the time the wrongful act giving rise to plaintiff's claim occurred. I do not read *Eberle Brewing Co* as establishing any such bright-line rule. The claim in *Eberle Brewing Co* arose from a collision between an automobile driven by a Mr. Greenamyer and a carriage drawn by a team of horses, wherein one of the horses owned by plaintiff was injured and because of those injuries was killed. *Id*. at 140-141. The accident occurred when Greenamyer, an employee of defendant whose job was to inspect cars assembled at a facility owned by a third-party contractor, used one of the third-party contractor's not-yet-released cars after work hours to drive a salesman, who purportedly worked for the defendant, first to one of the defendant's other plants, and then to the railroad station. *Id*. at 144. The plaintiff sued the defendant for the value of the horse, seeking to hold defendant liable for Greenamyer's conduct. *Id*. at 141. Although negligence on the part of Greenamyer was conceded, our Supreme Court held that the defendant was not liable for Greenamyer's conduct. In addition to observing that Greenamyer was operating the vehicle outside of his working hours, the Supreme Court noted:

> There is no testimony tending to prove that he was employed by the [defendant] to drive this machine, at this time, or to carry a passenger for his employer, or for any one else. His trip was for the accommodation of the salesman who rode with him, or for his own pleasure, or both. . . . [I]t does not appear that the salesman passenger was upon any business of the [defendant], and in inference is resorted to, it may be inferred that his visit was made in his own interest. Beyond this it is not made to appear that Mr. Greenamyer was in any sense acting within the scope

-6-

of his employment. The car did not belong to him, nor to his employer. [*Id.* at 145.]

Although Greenamyer was "off duty" at the time of the accident, the *Eberle* Court also took into account the lack of evidence tending to prove that the defendant employed him to drive the vehicle or carry passengers, that the defendant owned the car, or that the salesman, and by implication Greenamyer, was on the defendant's business. *Id.* at 144-145. Accordingly, upon a careful review of *Eberle Brewing Co*, one cannot say that Michigan's Supreme Court established a bright-line rule regarding an employee's on- or off-duty status for purposes of respondeat superior liability. The most that one can say of *Eberle Brewing Co* in that regard is that an employee's work schedule is but one factor courts should consider when determining if an employee is acting within the scope of employment.

Second Restatement of Agency, 2d, § 228, p 504, provides the following general guidance for determining when conduct is within the scope of employment:

(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

The temporal and spatial components of the scope of employment set forth above in (1)(b) are further articulated in Restatement, §§ 233-234, pp 516-523. These sections provide that an employee's act is within the course of employment only if it is done "within a period which has a reasonable connection with the authorized period[,]" § 233, and "in the authorized area or in a locality not unreasonably distant from it[.]" § 234. Regarding the temporal component, comments to § 233 note:

> The employment exists only during the time when the servant is performing or should be performing the work which he is employed to do. . . . When it begins and terminates is determined by the terms of the employment and *all the facts of the situation*. . . . In determining whether the act is within the period of service, the fact that the act is upon the premises or that the instrumentality is the employer's is of importance, provided the act itself is one which might be proper if done within the working time. [Restatement, § 233, comment a, p 516 (emphasis added).]

Further, acts during a "forbidden time" are not necessarily outside the scope of employment. *Id*. at comment b, p 517. "There is a fringe of time within which the employment may continue. The extent of this is a matter of degree, *depending upon all the factors*—the place, purpose, kind of act, whose instrumentality is used, and the extent of departure from the normal time for performance." *Id*. (emphasis added).

These provisions of the Restatement make clear that whether an employee is "on the clock" is, alone, not determinative of whether the employee's actions fall within the scope of employment. Likewise, in the related context of immunity under the Governmental Tort Liability Act, MCL 691.1401 *et seq*.,[7] this Court has identified the "temporal and spatial boundaries" created by an employment relationship as only one factor that is relevant to determining if a government agent was acting within the scope or course of employment.[8] *Niederhouse v Palmerton*, 300 Mich App 625, 633; 836 NW2d 176 (2013).

In *Niederhouse*, this Court applied principles of common-law and agency law to determine whether a plaintiff injured in an accident with an airboat could pursue a negligence claim when the pilot of the airboat was a deputy with the Roscommon Sheriff's Department. The incident occurred at Roscommon County's annual Winterfest. *Id*, 300 Mich App at 628. Before the festival, the county's sheriff solicited off-duty deputies to volunteer to provide airboat rides on the frozen surface of Lake Higgins. *Id*. The defendant, a deputy who was a trained airboat pilot, attended the festival with his family. *Id*. He was off-duty at the time. Although he had not volunteered to give airboat rides, he approached the deputy who was giving rides to see if he needed any help. *Id*. The defendant took over for the deputy giving airboat rides, and was giving a ride to several people when the defendant's airboat struck a snowmobile and slid toward the plaintiff, pinning the plaintiff's leg between the snowmobile and the airboat and causing severe injury. *Id*. at 629. The plaintiff filed suit against Roscommon County, the sheriff, and the defendant, asserting claims of ordinary negligence against all of the defendants, and a claim of gross negligence against the defendant. *Id*. at 630. All three defendants successfully moved for summary disposition on the grounds of governmental immunity, and the plaintiff appealed,

---

[7] In *Backus v Kauffman*, 238 Mich App 402, 407; 605 NW2d 690 (1999), this Court recognized the "jurisprudential symbiosis that exists between the doctrine of governmental immunity and traditional principles of common-law tort and agency law when the issue involves the actions of a governmental employee." Given the relationship between these areas of law, the Court relied on common-law tort and agency principles in the context of the governmental immunity issue before it. *Id*. at 407 n 1.

[8] "Course of employment" and "scope of employment" refer to the same concept, the core component of which is an employment relationship. See *Hamed*, 490 Mich at 11; *Backus*, 238 Mich App at 407. While relying on authority that referred to "scope of employment," the Court in *Niederhouse* used "course" rather than "scope" of employment because that term appeared in MCL 691.1407(2), the provision of the governmental immunity act, MCL 691.1401 *et seq*. that governed resolution of the case. Similarly, for the sake of consistency and clarity of analysis, we will use "scope of employment." The question of whether Bradley exceeded the scope of his *authority* in the manner in which he handled the situation is not before this Court.

-8-

challenging only the grant of summary disposition to the defendant-deputy, and specifically limiting the appeal "to whether the defendant was acting in the [scope] of his employment when the accident occurred." *Id*. at 630-631. If he were found to not be acting within the scope of his employment, the defendant deputy would not be entitled to the immunity protections afforded by the Governmental Tort Liability Act, (GTLA), MCL 691.1401 *et seq.*, specifically MCL 691.1407(2).

On appeal, this Court affirmed the trial court's conclusion that the defendant was acting within the scope of his employment for purposes of governmental immunity. *Id*. at 634. Although the defendant was off duty and not acting in the typical environment of his employment (and thus, not working strictly within the authorized space and time limits), the Court agreed that the defendant was immune from tort liability because he was a governmental agent performing a task that he would not have performed but for his employment relationship with the county sheriff's department. *Id*. at 634. See also Restatement, § 228(1)(b). The Court's conclusion was not swayed by the fact that the defendant was not specifically instructed by his employer to take over the airboat operation because "even if an act is *contrary* to an employer's instructions, it may be within the [scope] of employment if 'the employee accomplished the act in furtherance, or [in] the interest, of the employer's business.' " *Id*. at 635, quoting *Hamed*, 490 Mich at 11 (alteration in *Niederhouse*); see also Restatement, § 228(1)(c). Likewise, it was not dispositive that the defendant was unpaid for his services, because "an employee's gratuitous work may still be within the [scope] of his employment." *Niederhouse*, 300 Mich App at 635, citing 2 Restatement Agency, 3d, §7.07(3)(b), p 198 (stating, "the fact that work is performed gratuitously does not relieve the principal of liability").

Based in part on the reasoning set forth in *Niederhouse*, I would conclude that the trial court erred by focusing solely on Bradley's off-duty status without taking into account the surrounding circumstances of the August 17, 2013 incident to determine whether Bradley was engaged in defendant's service or about defendant's business at the time. Viewing the evidence in the light most favorable to plaintiff, the evidence created a genuine issue of material regarding whether Bradley was acting within the scope his employment when plaintiff was injured. Bradley testified that he was visiting Henry VIII-South for recreational purposes on the night in question, and defendant's manager corroborated his testimony. Thus, as was the case with the deputy in *Niederhouse*, the conduct at issue did not occur within the typical period of Bradley's employment. *Niederhouse*, at 634. However, unlike in *Niederhouse*, *id*., the conduct did occur on defendant's premises where Bradley would normally carry out his employment duties. See Restatement, § 228(1)(b). Bradley's job duties as a bouncer included intervening in any fights that occurred among the patrons, dancers, or other employees. Hence, the conduct at issue in this matter is the precise task that Bradley was authorized to perform when on duty. Further, assuming Bradley did, in fact, remove plaintiff from the vicinity of the fight and push her into the dressing room, his action was consistent with the club's typical procedure of separating and detaining those who were apparently involved in a fight. See Restatement, § 228(1)(a).

While Bradley conceded that he was not required to intervene in altercations on his night off, he repeatedly stated that he felt bound to assist the club's manager and the on-duty bouncers because he worked with them and they operated as a team. Bradley testified that it was not the first time he helped out when he was off-duty, and he observed that other bouncers have done the same thing in the past. He also opined that the club's manager would not have objected to his

intervention. Evitts confirmed that the bouncers generally acted as a team, saying, "Everybody kind of groups together. They would help each other out. Nobody would sit there and watch the other one break up a fight." See Restatement, § 228(1)(c). This testimony, construed in the light most favorable to plaintiff, implies that the previous relationship between defendant and its bouncers, including Bradley, would permit Bradley to intervene in the fight while off-duty. Moreover, as explained in *Niederhouse*, 300 Mich App at 635, the employer need not specifically direct an off-duty employee to act in order for the employee's actions to be within the course of his or her employment. Not only was the defendant-deputy in *Niederhouse* not directed by his employer to assume the duty of giving airboat rides, but his services were not required, as another deputy had been assigned to the task. *Id*. at 628.

The evidence indicating that Bradley acted for his employer's benefit rather than for his own is at least as strong here as in *Niederhouse*, where the defendant-deputy took over giving airboat rides from the deputy whose duty it was to give the rides, so that he could give the last ride of the day to his family and neighbors. *Id*. at 628-629. In the present case, Bradley intervened only when he thought Evitts and the other bouncer were outnumbered and about to be attacked from behind. Moreover, the nature of Bradley's alleged assault and battery—whether viewed as an intentional tort or as a criminal act—does not allow defendant to avoid liability as a matter of law because the act of separating combatants and maintaining order on the premises is a regular and foreseeable part of operating a strip club. See Restatement, § 228(1)(d). Further, that Bradley was not compensated for his services is not dispositive, as "an employee's gratuitous work may still be within the [scope] of his employment." *Niederhouse*, 300 Mich App at 635.

Put simply, the testimony supported a finding, when viewed in the light most favorable to plaintiff, that Bradley acted within the scope of his employment given the informal nature of his employment schedule and the particular dynamics of the night in question. Bradley was solicited to work as needed, he was hired orally, rather than in writing or pursuant to a written schedule, and the nature of his employment was to fill in the gaps when regularly scheduled employees took time off or the club needed extra help based on crowd expectations. A jury could easily and reasonably conclude that although he may not have been asked to work on the night in question, the circumstances where a fight broke out and the scheduled bouncers were about to be outnumbered was just such an incident where the club needed his services and his stepping in qualified as acting within the scope of his employment.

For all of these reasons, I would conclude that it does not clearly appear that Bradley was acting outside the scope of his employment as a matter of law. The issue requires a fact-intensive inquiry rather than the application of a bright-line rule. Analysis of the totality of the circumstances surrounding Bradley's conduct creates a material question of fact regarding whether, given the particular characteristics and dynamics of his employment relationship with defendant, Bradley was acting in the scope of employment when he undertook to help break up the fight that led to plaintiff's injuries. For this reason, I would reverse the trial court's summary disposition order and remand the case for further proceedings.


/s/ Jane M. Beckering


-10-