# STATE OF MICHIGAN

# COURT OF APPEALS

TIFFANY DIXON,

      Plaintiff-Appellant,

v

CITY OF DETROIT and WILLIAM O'BRIEN,

      Defendants-Appellees.

UNPUBLISHED
March 29, 2018

No. 333554
Wayne Circuit Court
LC No. 14-014660-NO

Before: STEPHENS, P.J., and CAVANAGH and K. F. KELLY, JJ.

PER CURIAM.

Plaintiff brought this action under the Michigan Civil Rights Act (CRA), MCL 37.2101 *et seq*., and 42 USC 1983 after she was sexually assaulted by Deon Nunlee, a former city of Detroit police officer, while Nunlee was investigating a complaint of domestic violence. The trial court granted summary disposition in favor of defendant, city of Detroit, pursuant to MCR 2.116(C)(10).[1] Plaintiff appeals as of right. We affirm.

It does not appear to be in dispute that on October 30, 2013, plaintiff was sexually assaulted by then-Detroit Police Officer Deon Nunlee when Nunlee and his partner, William O'Brien, were dispatched to plaintiff's home to investigate a domestic violence complaint. When Nunlee and O'Brien arrived at the home, Nunlee directed O'Brien to stay with plaintiff's boyfriend, Vince MacMillan, on the first floor, and he then instructed plaintiff to "go upstairs." After Nunlee followed plaintiff up the stairs, she started to show Nunlee the damage that MacMillan had caused. Nunlee asked plaintiff if she wanted "him to take care of it," and plaintiff replied, "Yes." At that point, Nunlee grabbed plaintiff's wrist, placed her hand on top of his "penis area," and then made plaintiff rub the top of his penis. He also licked plaintiff's breast and vagina. Because her children were also upstairs and Nunlee had a gun, plaintiff was afraid to say anything and did not resist. Eventually, Nunlee left plaintiff, walked downstairs, briefly spoke with MacMillan, and then he and O'Brien left the home.

---

[1] The trial court also granted summary disposition in favor of defendant, William O'Brien. Plaintiff, however, is not appealing that aspect of the trial court's order.

The next morning, with a friend's encouragement, plaintiff contacted Internal Affairs ("IA") for the Detroit Police Department ("DPD") and reported the sexual assault. During the IA investigation that ensued, DNA testing of plaintiff's vaginal area matched Nunlee's DNA. Nunlee was charged with sexual misconduct and misconduct in office. He agreed to resign from the Detroit Police Department and pleaded guilty to second-degree criminal sexual conduct and misconduct in office, for which he was sentenced to serve 19 months to 15 years' imprisonment.

Plaintiff filed this action naming as defendants the city of Detroit, Nunlee, and "Deon Nunlee's Partner." In her second-amended complaint, plaintiff asserted liability solely against the city of Detroit and William O'Brien. Plaintiff's amended complaint alleged that the city was aware that Nunlee had a history of sexual assault and that it did nothing to prevent plaintiff from being another victim. In Counts I and II, plaintiff alleged violations of her constitutional rights under 42 USC 1983. In Count III, plaintiff alleged that defendant was liable for sexual harassment affecting public services under the CRA.

Defendant filed a motion for summary disposition. Defendant argued that it was entitled to summary disposition because it did not have any notice that Nunlee was a sexual predator, planned to attack, or was in the process of attacking plaintiff. Defendant then reasoned that because none of its actions were the cause of plaintiff's injuries, and Nunlee's conduct was an unforeseeable criminal act, none of plaintiff's claims against it were viable.

In her response to defendant's motion, plaintiff argued that she presented viable claims under the CRA and 42 USC 1983 because an official custom, policy, or practice of the city's police department deprived her of her constitutional rights. She further argued that there existed a question of fact with respect to whether defendant acted with deliberate indifference toward a substantial risk of serious harm. Plaintiff asserted that events in 2009 and 2010 put defendant on notice that Nunlee was a sexual predator. She then reasoned that because Nunlee's sexual assault of plaintiff was foreseeable, defendant could be held liable for Nunlee's actions.

The trial court granted defendant's motion for summary disposition. The court found that the city could not be held liable for Nunlee's conduct under the CRA because his criminal actions were unforeseeable. The court specifically rejected plaintiff's position that events in Nunlee's employment history put defendant on notice that plaintiff was at risk of being sexually assaulted. The court also found that plaintiff's § 1983 claims could not withstand summary disposition. This appeal followed.

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Veenstra v Washtenaw Country Club*, 466 Mich 155, 159; 645 NW2d 643 (2002). Defendant moved for summary disposition pursuant to MCR 2.116(C)(10). A motion under this subrule tests the factual sufficiency of the plaintiff's complaint. *Spiek v Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998). In reviewing a motion under subrule MCR 2.116(C)(10), this Court must consider "the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004).

Plaintiff argues that the trial court erred when it granted summary disposition in favor of defendant on her claims of municipal liability under 42 USC 1983. When thoroughly distilled, plaintiff's claims are premised on a somewhat convoluted and complex failure to train theory. Plaintiff does not assert, however, that defendant failed to train Nunlee that sexually assaulting a citizen violated police department policies. Instead, she asserts that defendant failed to train those supervisory officers around Nunlee. Plaintiff essentially argues that the lack of supervision allowed Nunlee to sexually assault her. She attributes the lack of supervision to defendant's custom of failing to adequately train its officers in investigating and documenting police misconduct and addressing the challenges that arise from the "blue code of silence." According to plaintiff, Nunlee's supervisors were insufficiently trained and had they been more appropriately trained, they would have recognized him for the sexual predator that he was. Plaintiff expands this theory to include the manner in which Nunlee's prior acts of alleged misconduct were investigated, as well as the manner in which defendant investigated all misconduct department wide. Because plaintiff has failed to demonstrate that defendant's failure to act amounted to deliberate indifference, we conclude that the trial court did not err in granting summary disposition in defendant's favor with respect to plaintiff's § 1983 claims.

A person is liable under 42 USC 1983 if he or she, "under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution[.]" A municipality may be held liable under § 1983 for maintaining unconstitutional polices. *Johnson v Vanderkooi*, 319 Mich App 589, 622; 903 NW2d 843 (2017). However, § 1983 does not provide for respondeat superior liability. *Monell v Dep't of Social Servs of New York City*, 436 US 658, 692; 98 S Ct 2018; 56 L Ed 2d 611 (1978). That is, "[a] municipality cannot be held liable under § 1983 solely because it employs a tortfeasor." *Payton v Detroit*, 211 Mich App 375, 398; 536 NW2d 233 (1995). Instead, "for a municipality to be liable, a plaintiff must show that an official municipal policy or custom caused [her] injury." *Johnson*, 319 Mich App at 622. "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v Thompson*, 563 US 51, 61; 131 S Ct 1350; 179 L Ed 2d 417 (2011).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Id*. This theory of liability against a municipal defendant has been described by the United States Supreme Court as "nebulous" and "tenuous," however, under certain scenarios, it is viable. *Id*. (citations omitted.) "The inadequacy of police training only serves as a basis for § 1983 liability 'where the failure to train amounts to deliberate indifference to the rights of persons whom the police come in contact with.' " *Slusher v Carson*, 540 F3d 449, 458 (CA 6, 2008) (citations omitted.) The "deliberate indifference" standard requires proof that "a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 US at 61 (citation omitted). Put another way, "when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id*. The United States Supreme Court has imposed this stringent standard of fault because a finding of municipal liability in the context of a failure to train amounts to a judicial determination that a city decided

to violate the Constitution. *Id.* at 61-62. Ordinarily, a pattern of similar constitutional violations by untrained employees is necessary to demonstrate deliberate indifference in the context of a failure to train allegation. *Id.* at 62.

In support of her position that defendant failed to properly train, and by extension, supervise, investigate, and discipline, its officers, plaintiff relies on the affidavit of Jamie Fields, one of defendant's former employees. Fields apparently retired at the rank of deputy chief after 35 years as a law enforcement officer for the city of Detroit. In his affidavit, Fields avers that male police officers are frequently placed in positions where sexual contact with women is foreseeable. He then concludes that defendant has no recognition of this phenomenon and "there is no training regimen to appraise officers of this slippery slope or what has been referred in police literature as the 'continuum of compromise.' " Fields opined that "the need to train officers about the commonality and frequency in which police officers come in contact with female citizens during on duty encounters, and the susceptibility of the officer to misconstrue the signals as a consensual encounter is so obvious the failure to do so suggest deliberate indifference to the problem." He further avers that defendant has failed to appreciate the "code of silence" prevalent in police departments and take affirmative steps, through training, to eliminate or minimize its influence.

Fields significantly relies on a 1997 report authored by Special Counsel Merrick Bobb regarding the operations of the Detroit Police Department. Fields notes that Bobb made several recommendations to improve the department, which were never implemented by defendant. Fields did not acknowledge Bobb's findings within the report that "[d]uring the last few years, under the leadership of Chief McKinnon, the Detroit Police Department and its top management have initiated change in the Department's approach to police misconduct and management of risk."

Fields also takes issue with the manner in which defendant investigated police officer misconduct. Fields concludes that a "statistical review of the files" demonstrates a pattern and practice of failing to find responsibility on the basis of "preferring the officer's word over that of the complainant." With respect to Nunlee in particular, Fields opines, based on a review of his employment records it was obvious that Nunlee's performance as a police officer was substandard. From this, Fields concluded that "none of Nunlee's supervisors were given any training with regard to picking up criminal activity by officers under their command." He further concludes that none of Nunlee's supervisors were properly trained to recognize Nunlee's deficiencies and had they been properly trained, the supervisors could have more closely monitored Nunlee.

The evidence relied upon by plaintiff is insufficient to demonstrate that any alleged violation of plaintiff's constitutional rights was the result of an official municipal policy or custom, or that a question of fact existed in this regard. Fields's affidavit consists of bald suppositions with little to no explanation for how he reached his conclusions. Although Fields declares that defendant did not properly train its officers in the investigation of sexual assaults, he has provided no real basis for this opinion. As defendant notes, Fields did not address any specific inadequacy or deficiency in the police department's training programs, supervision, disciplinary system, or method of investigation. At best, Fields relies on evidence that 160 officers had been accused of sexual misconduct in general, and eight had been prosecuted.

-4-

These statistics do not address deficiencies in defendant's training of its sexual assault investigators. More importantly, plaintiff has failed to present evidence that defendant knew there existed deficiencies in its training protocols that facilitated an officer's ability to violate the civil rights of citizens the officer was hired to protect, and in the face of this knowledge, defendant took no action.

Plaintiff also asserts that defendant's investigation of Nunlee's alleged prior sexual misconduct evidenced its custom and policy of failing to properly train and investigate its officers and its deliberate indifference. We disagree. In 2009, SW accused Nunlee and his then-partner of forcing her to engage in oral sex with them after she was stopped for a traffic violation. At the time she made these charges, SW was visibly and highly intoxicated. When IA invested the allegations the next day, SW recanted. SW asserted that she was intoxicated, had lied, and had not been sexually victimized by the officers. At that point, the investigation was closed because no additional evidence existed to warrant further investigation in light of SW's withdrawal of her complaint. The second incident involved an allegation that Nunlee struck a federal detainee in the testicles and ribs. These allegations do not implicate conduct of a sexual nature, but rather, alleged excessive force. The investigation in this second matter was closed because the complainant was deported and the investigator concluded that he could not confirm or refute the allegations of misconduct. These incidents, both investigated but not pursued for arguably legitimate reasons, do not prove an unconstitutional policy or custom, or show that defendant acted with deliberate indifference. At most, they demonstrated that defendant had knowledge of one recanted and dubious allegation of sexual assault and one unsubstantiated allegation of excessive force. To demonstrate deliberate indifference, a plaintiff must show a pattern of similar incidents. *Connick*, 563 US at 62. No such pattern emerges from which one could draw an inference that a substantial risk of sexual assault existed and defendant acted with deliberate indifference to the risk.

None of the evidence relied on by plaintiff established that untrained or poorly trained supervisors failed to ferret out "badseeds" and then those undetected deviant officers went on to perpetrate sexual assaults on the unsuspecting public they were hired to protect. To prove deliberate indifference, plaintiff was required to present evidence that defendant was on notice that, absent additional specified training, it was "highly predictable" that one of its officers would sexually assault a female seeking the services of the police department. See *Connick*, 563 US at 71. Plaintiff has failed to establish a genuine issue of material fact as to whether defendant acted with deliberate indifference in the supervising, training, and disciplining its officers.

Furthermore, even accepting as true plaintiff's allegations that defendant failed to properly train and supervise its employees in the manner and method by which they investigated and responded to officer misconduct, plaintiff failed to demonstrate a causal connection between this alleged custom and Nunlee's sexual assault of plaintiff. The policy or custom must be the "moving force" behind the constitutional deprivations to impose liability on a municipal defendant. *Monell*, 436 US at 694. In this case, plaintiff has not shown that any action or inaction by defendant in the supervision and training of its officers was the moving force in Nunlee's sexual assault of plaintiff. There is no evidence on the record that Nunlee made the decision to assault plaintiff for any reason related to any of defendant's polices or customs, or that he was operating on an understanding that he could act with impunity because of an unstated but perceived custom of the department. Nunlee committed an intentional criminal act for no

-5-

other reason than his self-serving motivations. Accordingly, the trial court did not err when it granted summary disposition on plaintiff's § 1983 claims.

Plaintiff also sought to recover for alleged quid pro quo sexual harassment under the CRA, which prohibits discrimination because of sex in public services as well as in employment and public accommodation. MCL 37.2202 and MCL 37.2302. Unlawful sex discrimination prohibited by MCL 37.2302(1) includes sexual harassment. MCL 37.2103(i) provides:

> Discrimination because of sex includes sexual harassment. Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature under the following conditions:
>
> (*i*) Submission to the conduct or communication is made a term or condition either explicitly or implicitly to obtain employment, public accommodations or public services, education, or housing.
>
> (*ii*) Submission to or rejection of the conduct or communication by an individual is used as a factor in decisions affecting the individual's employment, public accommodations or public services, education, or housing.
>
> (*iii*) The conduct or communication has the purpose or effect of substantially interfering with an individual's employment, public accommodations or public services, education, or housing, or creating an intimidating, hostile, or offensive employment, public accommodations, public services, educational, or housing environment.

Quid pro quo sexual harassment is encompassed in the first two subdivisions of MCL 37.2103(1). *Hamed v Wayne Co*, 490 Mich 1, 9; 803 NW2d 237 (2011). Accordingly, a plaintiff seeking to recover for alleged quid pro quo sexual harassment affecting public services must show by a preponderance of the evidence "(1) that he or she was subjected to any of the types of unwelcome sexual conduct or communication described in the statute and (2) that the public service provider or the public service provider's agent made submission to the proscribed conduct a term or condition of obtaining public services or used the plaintiff's submission to or rejection of the proscribed conduct as a factor in a decision affecting his or her receipt of public services." *Id*. at 10.

In *Hamed*, the Michigan Supreme Court considered the scope of an employer's vicarious liability for quid pro quo sexual harassment affecting public services under the CRA. *Hamed*, 490 Mich at 5. In that case, the Supreme Court recognized that "[w]hen the harassment was committed by an agent and the plaintiff is pursuing a civil rights claim against the principal, as in this case, a court must always 'determine the extent of the employer's vicarious liability . . . .' " *Id*. at 10 (footnote omitted). The Court in *Hamed*, noting that the CRA specifically incorporates common-law agency principles, reiterated the general tenets of respondeat superior liability:

> The doctrine of respondeat superior is well established in this state: An employer is generally liable for the torts its employees commit within the scope of their employment. It follows that "an employer is not liable for the torts . . .

committed by an employee when those torts are beyond the scope of the employer's business." This Court has defined "within the scope of employment" to mean " 'engaged in the service of his master, or while about his master's business.' " Independent action, intended solely to further the employee's individual interests, cannot be fairly characterized as falling within the scope of employment. Although an act may be contrary to an employer's instructions, liability will nonetheless attach if the employee accomplished the act in furtherance, or the interest, of the employer's business. [*Hamed*, 490 Mich at 10-11 (footnotes omitted).]

The Court further noted, however, that the general rule that an employer is not liable for the acts of its employee outside the scope of its business is not without its exceptions. Specifically, it has long been recognized "that an employer can be held liable for its employee's conduct if the employer knew or should have known of [the] employee's *propensities and criminal record* before that employee committed an intentional tort." *Id*. at 12 (quotation marks and footnote omitted). This inquiry requires determining whether the employer had actual or constructive knowledge of (1) prior similar conduct and (2) the employee's propensity to act in accordance with that conduct. *Id*. Ultimately, the Court held that "an employer's liability for the criminal acts of its employees is limited to those acts it can reasonably foresee or reasonably should have foreseen." *Id*. at 13.

The trial court applied the foreseeability test and concluded that, as a matter of law, defendant could not be held responsible for Nunlee's criminal acts. The court did not err in this regard. Nunlee had no prior disciplinary history. Plaintiff relied on the two events in Nunlee's employment history, described earlier, in support of her claim that it was foreseeable that Nunlee would sexually assault her. The 2009 incident involved similar allegations, but immediately after the complaint was made, the complainant recanted. Although that complainant has recently reiterated her charges against Nunlee, she only did so after being approached by plaintiff to provide an affidavit for purposes of the summary disposition motion. More importantly, defendant did not have knowledge of the woman's assertion that she was coerced into withdrawing her complaint until after plaintiff was sexually assaulted. The second event upon which plaintiff relies involved the federal detainee. Despite plaintiff's characterization to the contrary, this incident did not involve conduct sexual in nature, but rather the use of excessive force. Viewed in the light most favorable to plaintiff, these allegations of past misconduct could not have put defendant on notice that Nunlee would sexually assault plaintiff, in her own home, with his partner and her boyfriend waiting on the first floor. Defendant had no actual or constructive knowledge of prior *similar* conduct or of Nunlee's propensity to act in accordance with that conduct. Accordingly, the trial court did not err when it concluded, as a matter of law, that defendant could not be held vicariously liable for quid pro quo sexual harassment by its officer.

Lastly, plaintiff challenges the trial court's ruling on a discovery matter. This Court reviews the grant or denial of a discovery motion for an abuse of discretion. *Augustine v Allstate Ins Co*, 292 Mich App 408, 419; 807 NW2d 77 (2011). An abuse of discretion occurs only when the trial court's decision falls outside the range of a reasonable and principled outcome. *Id*.

During the course of discovery, defendant identified 160 Detroit police officers who were accused of, what the parties have generally characterized as, sexual misconduct. However, defendant did not provide any related documents or investigatory files. Plaintiff served on defendants a fourth request for production of documents in which it requested, with respect to these 160 individuals, that defendants produce the "complete investigation files" of these officers "who were accused of, involved in and/or found guilty of sexual misconduct, sexual harassment or criminal sexual conduct." A similar document request was submitted as to additional individuals. When defendants timely objected to this discovery request, plaintiff filed a motion to compel discovery.

In its response to plaintiff's motion, defendant argued that plaintiff's document requests were overly broad, overly burdensome, and sought irrelevant information. Specifically, defendant asserted that 75 to 80% of the files requested were unrelated to criminal sexual misconduct against a citizen. Defendant asked the court to order plaintiff to tailor her discovery to "on-duty criminal sexual misconduct against a citizen" within the last five years.

The court granted in part and denied in part plaintiff's request for the production of documents. Specifically, the court compelled defendant to produce files of any officer convicted of any criminal sexual conduct during the course of his or her employment. Defendant would not be required to produce any investigatory files of officers who were simply accused of or involved in sexual misconduct or sexual harassment.

Plaintiff argues that the trial court abused its discretion when it imposed limits on its ability to conduct discovery. We disagree. "It is well settled that Michigan follows an open, broad discovery policy that permits liberal discovery of any matter, not privileged, this is relevant to the subject matter involved in the pending case." *Augustine*, 292 Mich App at 419 (citations omitted). However, a trial court is within its discretion to limit discovery when it becomes excessive or abusive. MCR 2.302(C); *Chastain v Gen Motors Corp*, 254 Mich App 576, 593; 657 NW2d 804 (2002).

While plaintiff's original discovery request would have yielded investigation files on complaints substantially similar to the events in this case, it was sufficiently overbroad to also snag investigations on complaints wholly unrelated to the theories of liability in this case. Specifically, plaintiff has alleged that due to poor training, defendant did not adequately investigate complaints of sexual assaults perpetrated by officers on citizens they are employed to protect. However, the breadth of plaintiff's discovery request also ostensibly included complaints, for example, between co-workers, by officers not on duty, baseless claims, and claims not involving physical contact of a sexual nature.

Further, defendant argued that in order to comply with the discovery request, as written, it would be required to review 200 to 300 investigation files maintained by the City of Detroit Human Resources Equal Employment Opportunity Office, City of Detroit Police Department Office of the Chief Investigator, and the City of Detroit Internal Affairs Office. Defense counsel represented that it would be inordinately time consuming and expensive to review the files, and that it would take months to comply with the production. Defendant further noted that plaintiff's document requests were submitted in December 2015 and discovery, which had already been extended, was scheduled to close on January 31, 2016.

Plaintiff argues that the requested discovery, in its entirety, was relevant to her theories of liability. Plaintiff asserts that

> [t]he files of officers not convicted was actually much more relevant to show to what extent the DPD's internal investigation of sexual assault complaints either involved police cover-up or incompetence—which is one of Plaintiff's principal claims of widespread custom, policy and practice in the department. Further, that discovery would have allowed Plaintiff to review the actual audio interrogation of witnesses and to contact the victims who brought the complaints to determine if they, like Sarah Woodson, had been threatened or otherwise silenced despite legitimate complaints of sexual abuse.

Plaintiff's argument confirms the questionable and speculative relevancy of the information sought and suggests that a fishing expedition was contemplated. Michigan's commitment to open discovery does not sanction or facilitate fishing expeditions. *Augustine,* 292 Mich App at 419 (citation omitted).

Considering the foregoing factors, it is difficult to conclude that the trial court abused its discretion when it limited the scope of plaintiff's document requests. Plaintiff's discovery requests were overbroad as written and sought documents not relevant to the litigation. While an argument might be made that the court could have tailored plaintiff's document requests with slightly more breadth, this would have essentially been the court litigating the case for plaintiff. In any event, it cannot be disputed that the discovery and production of the files ordered by the court would have provided plaintiff with information related to the manner and method in which investigations of sexual assault perpetrated by officers while on duty were handled, which was the purpose of plaintiff's stated objective. The trial court did not abuse its discretion when it denied in part plaintiff's motion to compel discovery.

Affirmed.

/s/ Cynthia Diane Stephens
/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly